UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BURTON FLORENCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-01429-SEB-MPB |
| ) | |
| WEXFORD OF INDIANA, LLC, ) | |
| BRUCE IPPEL, ) | |
| MARK CABRERA, ) | |
| ALUMMI STAFFING, LLC, ) | |
| ) | |
| Defendants. ) | |

**Order Granting Summary Judgment for Defendants Ippel, Cabrera, and Wexford**

Indiana prisoner Burton Florence is suing Dr. Bruce Ippel, Dr. Mark Cabrera, and Wexford of Indiana, LLC for deliberate indifference to his *H. pylori* infection and related gastrointestinal distress. The evidence does not create a reasonable inference that Dr. Ippel or Dr. Cabrera were deliberately indifferent to these medical needs while Mr. Florence was under their care. Nor does the evidence create a reasonable inference that Mr. Florence's recommended follow-up appointment with an offsite specialist was denied as a result of a Wexford policy or widespread custom. Accordingly, summary judgment for Dr. Ippel, Dr. Cabrera, and Wexford is **GRANTED**.

**I. Summary Judgment Standard**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schools*, , 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## I. Factual Background

### A. Collapse and Hospitalization

On March 7, 2019, Mr. Florence stood up in the middle of the night to go to the bathroom when he became lightheaded and collapsed in his cell. Dkt. 99-1, p. 18; dkt. 99-3, p. 2. He told the medical staff that he had black stool, poor appetite, and mild epigastric pain for the last three days. Dkt. 99-3, p. 3. Dr. Ippel diagnosed Mr. Florence with a gastrointestinal bleed and ordered his transport to Ball Memorial Hospital. *Id.*; dkt. 99-1, p. 19.

Mr. Florence was treated at Ball Memorial Hospital for three days. Dkt. 99-3, pp. 6-12. His hospital records describe his treatment as follows: "Upper GI bleed due to duodenal ulcer— the patient was admitted and taken for endoscopy as noted above. At the time of endoscopy, a biopsy was taken. By the time of discharge, the final read did not return; however, the pathologist stated the pretest probability of H pylori infection was high enough to warrant empiric treatment. The patient was initiated on quadruple antibiotic therapy, which will need to be continued for 14 days. He was discharged in stable condition." *Id.* at 8. The hospital records also state,

"The patient will need to schedule follow-up appointment with GI physician, Dr. Binoy Ouseph in 2 months to discuss further management of this chronic condition." *Id.*

### B. Follow-up Care with Dr. Ippel

Mr. Florence had an appointment with Dr. Ippel the morning after he returned to prison. According to the medical records from this appointment, Mr. Florence told Dr. Ippel that "he slept well and felt normal with no G.I. complaints. He said that his stool had normalized with no further melena or visible blood. Appetite was okay as well. No additional complaints were discussed this morning." *Id.* at 15. At his deposition, Mr. Florence testified that at the March 11 appointment, "I was better than I was, but I wasn't a hundred percent." Dkt. 99-1, p. 21. When he was asked "What was still ongoing that you would say caused you not to be a hundred percent?" Mr. Florence answered, "The mental toll that it takes on a person from being rushed to the hospital," and the anxiety of having an internal injury that he could not see. *Id.* at 21-22. Dr. Ippel continued Mr. Florence on the antibiotics that were prescribed by the physicians at Ball Memorial Hospital, as well as Prilosec and Pepto-Bismol. Dkt. 99-3, p. 16.

Mr. Florence had another appointment with Dr. Ippel on March 18, 2019. *Id.* at 18-20. His medical records from this appointment state, "He did well in the infirmary with no further evidence of bleeding and was released. He's back here for a follow-up and says things are back to baseline. As far as his ability to eat and G.I. symptoms with the exception of some mildly looser stool than usual. No further dizziness or sense of passing out or other significant complaints." *Id.* at 18. Regarding future treatment, Dr. Ippel noted, "[Mr. Florence] will let us know if things deteriorated at all. He will finish out his meds which were reviewed . . . Additional interventions depending on how he does. Try to get a copy of the formal discharge to find out exactly what the findings were for HP assessment." *Id.*

3

Dr. Ippel did not see Mr. Florence after the appointment on March 18. Dkt. 99-2, para. 16.

Dr. Ippel had ordered a blood test on March 11, 2019, and the blood draw was collected from Mr. Florence on April 3, 2019. Dkt. 99-2, para. 23; dkt. 99-4, p. 2. Lab tests showed that his hemoglobin levels were low; the normal range is 13.5-17.5, and Mr. Florence's levels were 11.7. Dkt. 99-4, p. 2. His hematocrit levels were also low; the normal range is 41-53, and Mr. Florence's hematocrit levels were 38.5. *Id.* According to Dr. Ippel, "Although the results demonstrated by these readings were lower than normal, they were not so precipitously low that the results, by themselves, would evince a need for additional diagnostic testing or a concern of a gastrointestinal bleed." Dkt. 99-2, para. 25.

## C. Appointment with Dr. Cabrera

Mr. Florence had an appointment with Dr. Cabrera on April 19, 2019. Dkt. 99-3, pp. 21-23. The medical records reflect that Mr. Florence had "[b]listers on lip from one of the antibiotics he was on for H pylori," and that he was experiencing some symptoms of gastroesophageal reflux disease. *Id.* at 21. There had been "bright red blood on toilet paper in the last two [bowel movements]" as well. *Id.* Mr. Florence had not shown signs of reflux or vomiting. *Id.* at 22.

Dr. Cabrera ordered a blood test, and a sample was collected from Mr. Florence on April 30, 2019. Dkt. 99-4, pp. 4-5. His hemoglobin levels were low but higher than they had been earlier in the month (12.4). *Id.* at 4. His hematocrit levels were also low but higher than they had been earlier in the month (40.1). *Id.* at 4. His blood also revealed IgG antibodies for *H. pylori*. *Id.* at 5. The presence of these antibodies does not mean that Mr. Florence had an active *H. Pylori* infection at that time; it just means that he had a past or present *H. Pylori* infection.[1]

---

[1] https://www.cdc.gov/nchs/data/nhanes/nhanes_99_00/lab11_met_helicobacter_pylori.pdf ("The presence of *H. pylori* specific IgG antibodies in human serum has been shown to be associated with past or present *H. pylori* colonization.") (last visited August 10, 2022).

Dr. Ippel notes that Mr. Florence's hemoglobin and hematocrit levels were still low, but that they had increased since his previous blood draw sixteen days earlier. Dkt. 99-2, para. 6. Dr. Ippel opines that "[b]right red blood on toilet paper would indicate a superficial injury, such as hemorrhoids. [Whereas] [e]vidence of internal bleeding, like that suffered by Plaintiff on March 7, 2019, would be dark, tarry stool. Plaintiff did not complain of this symptom [at the appointment on April 19]." *Id.* at para. 19.

### D. Wexford Policy

Mr. Florence claims that Wexford has a policy or custom of denying necessary offsite medical care to save money. He has designated Wexford's Technical Proposal to the Indiana Department of Correction as evidence of this policy or custom. *See* dkt. 107, pp. 16-38. He directs the Court to a section of this proposal titled, "Offsite Specialty Care." *Id.* at 30. The section provides, in part, "Wexford will make every effort to minimize offsite clinic trips. Our clinical staff will provide routine follow-up care within the IDOC facilities to reduce the need for repeat offsite visits. Additionally, a Wexford physician or mid-level practitioner will review the results of each outside consult to determine if the offender requires continued offsite specialty treatment." *Id.*

Wexford did not schedule Mr. Florence for an offsite follow-up with gastrointestinal specialist Dr. Binoy Ouseph, as recommended in his discharge paperwork from Ball Memorial Hospital. Dkt. 108, pp. 6-7. Mr. Florence argues that "Wexford's Technical Proposal was the moving force behind Dr. Ippel interfering with the prescribed treatment orders of Ball Memorial Hospital's release instructions." *Id.* at 7 (cleaned up). He also argues that "[a]s a result of this longstanding practice, his ulcer-induced *H. pylori* was prolonged and exacerbated because he was denied access to GI specialist Binoy Ouseph, M.D. and his expertise in GI care and treatment." *Id.*

5

### E.  *H. Pylori*

*H. pylori* is one of the most prevalent bacterial infections in the world. In developing countries, more than 80% of the population is *H. pylori* positive. In industrialized countries, up to 40% of the population is *H. pylori* positive. The indication is that *H. pylori* is acquired in early childhood. Dkt. 99-2, para. 29.

There are a number of diseases that may result from an *H. pylori* infection. These include gastritis, which is an inflammation of the lining of the stomach, peptic ulcer disease, and gastric cancer. *Id.* at paras. 33-34; dkt. 107, p. 2.

A common treatment for *H. pylori* is a quadruple therapy consisting of a bismuth compound, a protein pump inhibitor, and two antibiotics. These therapies typically see an eradication of over 80% of *H. pylori* in a patient's system. Dkt. 99-2, para. 35.

Whenever *H. pylori* infection is identified and treated, testing to prove eradication should be performed using a urea breath test, fecal antigen test, or biopsy-based testing at least four weeks after the completion of antibiotic therapy and after PPI therapy has been withheld for one-to-two weeks. Dkt. 107, p. 5. This time frame is critical, as enough time is necessary for any surviving bacteria to populate the gastric environment and become detectable on repeat testing. *Id.* at 14.

### III. Discussion

#### A.  Eighth Amendment Claims

##### 1.  Deliberate Indifference Standard

Because Mr. Florence is a convicted prisoner, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment."). The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 772, 727-728 (7th Cir. 2016) (en banc).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Courts look "at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'"

7

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

    2. Analysis

        **i.    Dr. Ippel and Dr. Cabrera**

Dr. Ippel was involved in Mr. Florence's medical care when he collapsed on March 7, 2019, and at his follow-up appointments on March 11, 2019, and March 18, 2019. On the night of Mr. Florence's collapse, Dr. Ippel diagnosed Mr. Florence with gastrointestinal bleeding and ordered his transport to Ball Memorial Hospital. Dkt. 99-3, pp. 2-5. Upon his return from Ball Memorial Hospital, Mr. Florence had two follow-up appointments with Dr. Ippel. *Id.* at 13-20. He determined that Mr. Florence did not have any gastrointestinal distress; he continued Mr. Florence's prescriptions for antibiotics, Pepto-Bismol, and Prilosec, as directed by the hospital physicians; and he told Mr. Florence to submit a healthcare request if his symptoms returned. *Id.* There is no evidence that Mr. Florence submitted a healthcare request that was reviewed by Dr. Ippel, and there is no evidence that his gastrointestinal symptoms returned while he was under Dr. Ippel's care. Finally, Dr. Ippel ordered a blood test, which was collected on April 3, 2019, that did not indicate Mr. Florence was experiencing gastrointestinal bleeding. Dkt. 99-2, paras. 22-25.

Dr. Cabrera had a single appointment with Mr. Florence on April 19, 2019. Dkt. 99-3, pp. 21-23. Mr. Florence had some gastrointestinal distress at this appointment, but he did not have vomiting or reflux. *Id.* He told Dr. Cabrera about bright-red blood on the toilet paper, but this was indicative of superficial bleeding like hemorrhoids and not gastrointestinal bleeding like a peptic ulcer. *Id.*; dkt. 99-2, para. 19. Dr. Cabrera ordered a blood test, which was collected on April 19, 2019, that did not indicate Mr. Florence was experiencing gastrointestinal bleeding.

8

Dkt. 99-2, para. 27. He also ordered a blood test that showed IgG antibodies in Mr. Florence's blood, which was indicative of a past or present *H. pylori* infection. *Id.* at para. 28; *supra* at n. 1.

Mr. Florence argues that these physicians were deliberately indifferent to his serious medical need because they did not order his transport to Ball Memorial Hospital for a follow-up appointment with Dr. Ouseph. Dkt. 108, p. 7. He also argues that they should have scheduled him for a confirmatory test to determine whether his *H. pylori* infection had been eradicated. *Id.* at 10. In some circumstances, a prison physician may be deliberately indifferent for failing to follow the treatment recommendations of an offsite specialist. *E.g.*, *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004) (holding that "prescribing on three occasions the very medication the specialist warned against because of its constipating effect (when a non-constipating alternative was available) while simultaneously cancelling two of the three prescribed laxatives gives rise to a genuine issue of material fact about Reed's state of mind").

Given the totality of Mr. Florence's care, the evidence does not support a reasonable conclusion that Dr. Ippel or Dr. Cabrera were deliberately indifferent to his serious medical needs. The Court finds persuasive the Seventh Circuit's unpublished decision in *Luckett v. Heidorn*, 566 F. App'x 516 (7th Cir. 2014). In that case, the plaintiff was seen by the prison medical staff after he experienced stomach and throat pain and began spitting up blood. *Id.* at 518. The plaintiff tested positive for *H. pylori*, and the defendant prison physician ordered a similar treatment regimen to the one Mr. Florence received—two antibiotics and Prilosec. *Id.* The plaintiff had a follow-up appointment at which he complained of throat pain and bleeding, but the defendant physician saw no evidence of throat bleeding and declined to order additional tests. *Id.* Instead, the defendant physician directed the plaintiff to eat a bland diet. *Id.* The Seventh Circuit affirmed summary judgment for the defendant physician, reasoning that the plaintiff "reported that he was

9

feeling better during his last consultation with the defendant, and there is no evidence in the record of a relapse after that date. Moreover, an inmate cannot demand specific care or to see a specialist, and Luckett's last word to the defendant gave him no reason to question the efficacy of the omeprazole regimen or to order more testing." *Id.* at 520 (cleaned up).

Like the plaintiff in *Luckett*, Mr. Florence was prescribed antibiotics and Prilosec, and his gastrointestinal distress subsided. Dr. Ippel confirmed that Mr. Florence's symptoms had subsided and that there was no evidence of continued gastrointestinal bleeding. He directed Mr. Florence to submit a health care request if his symptoms returned. No such health care requests have been designated as evidence, and there is no evidence that Dr. Ippel had any knowledge about whether Mr. Florence's symptoms returned. Dr. Cabrera also confirmed that there were no signs of gastrointestinal bleeding, and Mr. Florence did not report any serious gastrointestinal distress during their single appointment on April 19.

While there is evidence that an additional offsite appointment and confirmatory post-infection testing was recommended, the failure to order this offsite appointment, without more, does not support a reasonable finding of deliberate indifference. A confirmatory test may well have been a best practice, but given the other care that Dr. Ippel and Dr. Cabrera provided, and Mr. Florence's lack of further symptoms, it does not show that the defendants "knew of and disregarded an excessive risk to Mr. Florence's health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (cleaned up); *see also Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) ("Deliberate indifference entails something more than mere negligence."). Mr. Florence has not shown that the defendants ignored an excessive risk to his safety or that their failure to order an offsite follow-up appointment caused additional pain.

10

Accordingly, summary judgment for Dr. Ippel and Dr. Cabrera on Mr. Florence's Eighth Amendment claims is **GRANTED**.

### ii. Wexford

Mr. Florence is proceeding against Wexford under the theory set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To prevail, Mr. Florence must show that he was deprived of constitutionally adequate medical care as a direct result of a Wexford policy or custom and that Wexford "took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 236 (7th Cir. 2021).

When the policy at issue is not unconstitutional on its face, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the [corporation], and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (emphasis removed) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality)).

Wexford's policy regarding "Offsite Specialty Care" is not facially unconstitutional. The policy merely states that its onsite medical staff "will provide routine follow-up care within the IDOC facilities to reduce the need for repeat offsite visits. Additionally, a Wexford physician or mid-level practitioner will review the results of each outside consult to determine if the offender required continued offsite treatment." Dkt. 107, p. 30. Nothing in this policy states that Wexford will deny necessary medical care or refuse to permit offsite medical care when its clinicians are incapable of providing necessary care onsite. It is possible that, in practice, "mak[ing] every effort to minimize offsite clinic trips," *see id.*, could result in a pattern of constitutionally inadequate medical care. But there is no evidence of that here. The only evidence of an offsite follow-up appointment that was denied is the "single incident" that gave rise to this lawsuit. This single

incident is insufficient to prove that Wexford's Offsite Specialty Care policy was unconstitutional as applied to Mr. Florence. *Dean*, 18 F. 4th at 236. Accordingly, summary judgment for Wexford on Mr. Florence's Eighth Amendment claim is **GRANTED**.

### B. Medical Negligence Claims

The defendants have moved for summary judgment on Mr. Florence's medical negligence claim. *See* dkt. 99. But because there is no longer a federal claim pending in this lawsuit, the Court relinquishes supplemental jurisdiction over his Indiana medical negligence claim.

The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. Of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been

12

committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (internal quotation marks omitted).

The relevant factors weigh in favor of the Court following the "usual practice" in the Seventh Circuit and relinquishing supplemental jurisdiction. *Groce*, 193 F.3d at 501. The Court has not expended significant resources on the pending state-law claims. To the extent the parties have during discovery, which is not apparent from the record, those efforts can be duplicated in state court with relative ease. Relatedly, the Court decided the Eighth Amendment claim on the deliberate-indifference element, which is not at issue in the negligence claims. Finally, as always, comity favors allowing state courts to decide issues of state law.

Moreover, none of the exceptions to the usual practice of relinquishing supplemental jurisdiction apply here. The statute of limitations will not have run on Mr. Florence's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). Substantial resources have not been expended on these claims, especially any that cannot simply be re-used in state court. Nor is it absolutely clear how the medical negligence claim should be decided.

For these reasons, the Court exercises its discretion to relinquish supplemental jurisdiction over the remaining state-law claims.

## IV. Conclusion

For the reasons explained above, the defendants' motion for summary judgment, dkt. [99], is **GRANTED**. Mr. Florence's Eighth Amendment claims against Dr. Ippel, Dr. Cabrera, and Wexford are **DISMISSED**, and his medical negligence claims against these defendants are **DISMISSED without prejudice**. No partial final judgment enters at this time.

   **IT IS SO ORDERED**.

Date: 08/25/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

BURTON FLORENCE
973731
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Thomas Joseph Flynn
Eichhorn & Eichhorn, LLP
tflynn@eichhorn-law.com

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com

Blair Martin Roembke
EICHHORN & EICHHORN LLP (Indianapolis)
bmroembke@gmail.com

Michael Roth
EICHHORN & EICHHORN LLP (Indianapolis)
mroth@eichhorn-law.com